If no complaint is on file as basis for information for larceny, prosecution should be dismissed under Vernon's Ann. Code Cr. Proc. 1925, art. 415, note 5.

**2. Criminal law ⚖➡29.**

Where information charged theft of seed cotton, and, in another count, theft of cotton sack, and evidence showed that cotton and sack disappeared at same time, conviction and sentence for separate offenses *held* unauthorized.

Appeal from Lampasas County Court; J. Tom Higgins, Judge.

Lee Day was convicted of larceny, and he appeals. Reversed and remanded.

T. S. Alexander and H. F. Lewis, both of Lampasas, for appellant.

Sam D. Stinson, State's Atty., of Austin, and Robt. M. Lyles, Asst. State's Atty., of Groesbeck, for the State.

HAWKINS, J. [1]. This prosecution is by information. The record contains no complaint as a basis for the information. In such condition no jurisdiction is shown in the county court. Article 415, C. C. P. 1925. Wadgymar v. State, 21 Tex. App. 459, 2 S. W. 768; Diltz v. State, 56 Tex. Cr. R. 127, 119 S. W. 92. Other authorities are annotated in note 5 under said article 415 in volume 1, Vernon's 1925 C. C. P. We have not based disposition of the appeal on the defect in tne record pointed out, assuming that the clerk in preparing the transcript omitted the complaint, but, if in fact no complaint is on file supporting the information, the trial court is directed to dismiss the prosecution. Such would be the proper and necessary order of this court if reversal was not called for upon other grounds.

[2] In one count the information charges appellant with the theft of 380 pounds of seed cotton of the value of $20 from Ernest Smith on October 31, 1925. In another count he is charged with theft of a cotton sack valued at $1.50 from the same party on the same date. The court's charge is so worded as authorized separate conviction upon each count, even though the evidence shows that the cotton and cotton sack were taken at the same time, which would constitute but one offense. No objection was made to the charge; if so the record fails to show it. The jury returned a verdict finding appellant "guilty of stealing the cotton and cotton sack, and assess his punishment at six months in jail for each offense, without fine." This verdict was received by the court, and judgment entered thereon condemning appellant to confinement in the county jail for twelve months.

Appellant urged in his motion for new trial that the verdict finds no support in the evidence because it shows only one violation of the law, for which two penalties cannot be inflicted. We think this contention must be sustained. This is not an instance where in separate counts distinct misdemeanor offenses are charged, in which case it has been held convictions might be had for the separate offenses proved and penalties assessed for each offense. See Blackwell v. State, 92 Tex. Cr. R. 473, 244 S. W. 532, and authorities therein cited. The two counts in the present information might charge separate misdemeanor thefts, but, when the evidence is looked to, only one offense is shown to have been committed. The cotton was in the field in a pile, on top of which was the cotton sack. The sack and cotton disappeared at the same time. There is nothing in the evidence to indicate they were taken at different times. On the other hand, the logical conclusion from the evidence is that the theft of the sack and cotton was one transaction, consummated at a single "taking," and constituting but one offense.

For the reasons stated, the judgment must be reversed and the cause remanded.

---

### LETSINGER v. PANHANDLE & S. F. RY. CO.* (No. 2695.)

(Court of Civil Appeals of Texas. Amarillo. May 26, 1926. Rehearing Denied Oct 6, 1926.)

**1. Trial ⚖➡50.**

Better practice is that doubtful questions of evidence or procedure, such as question of jury viewing scene of accident, should not be proposed or discussed in presence of jury.

**2. New trial ⚖➡44(4)—In death action against railroad, unauthorized visit to scene of accident on Sunday by jurors who were discharged on Saturday till Monday morning held reversible error (Rev. St. 1925, art. 2175).**

In death action against railroad, unauthorized visit to scene of accident on Sunday by jurors who were discharged on Saturday till Monday morning *held* reversible error, since, under Rev. St. 1925, art. 2175, such view is not permissible except by consent of all parties, and

---

⚖➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction November 24, 1926.

then only under order of court and in presence of parties or counsel.

**3. New trial ⬡⟞144.**

Where misconduct of jurors in viewing scene of accident is shown, little weight is given their testimony as to effect of such view in making up verdict.

**4. New trial ⬡⟞56.**

Where jurors viewed scene of accident without authority, issue of whether there is error, as matter of law, turns on reasonable doubt as to whether verdict was affected.

Appeal from District Court, Lubbock County; Clark M. Mullican, Judge.

Action by J. W. Letsinger against the Panhandle & Santa Fé Railway Company. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

Vickers & Campbell, of Lubbock, for appellant.

Wilson & Randal, of Lubbock, Madden, Adkins & Pipkin, of Amarillo, and Terry, Cavin & Mills, of Galveston, for appellee.

HALL, C. J. The appellant filed this suit in the district court of Lubbock county to recover damages on account of the death of his wife and minor daughter, which occurred April 13, 1925, as a result of a collision between one of appellee's passenger trains and an automobile in which appellant's wife and daughter were riding upon a public road crossing near Monroe in Lubbock county. At the time of the collision appellant's son, James, 14 years of age, was driving the automobile; his daughter, Susie, was riding on the front seat with the driver, the mother and child who were killed being on the rear seat. It was alleged that the train was traveling at a speed of more than 45 miles per hour; that the automobile was being driven along the public road parallel with the railroad track for some distance, until the automobile turned to go over the crossing where the collision occurred. It was alleged that the railroad track "dipped" at about 400 yards south of the crossing, and that the train could not be readily seen by persons on the public road approaching the crossing in motor vehicles; that the view of the track and crossing were also obstructed by telegraph poles, right of way fence posts, and mail boxes, so that the occupants of the automobile could not readily see an approaching train; that the company's servants operating the train failed to blow the whistle for the crossing at least 80 rods therefrom, and to ring the bell continuously until the crossing was reached; that said operators failed to keep a lookout and to discover the danger and peril of the occupants of the automobile until at such time that a collision was inevitable; that no attempt was made to reduce the speed of the train, or to apprise the occu-

pants of the automobile of their danger until such time as a collision was unavoidable; that, had the proper signals been given, and a proper lookout kept by the defendant's servants, the serious situation of the occupants of the automobile would have been discovered in time to have avoided the collision; that the occupants of the automobile were exercising proper care and diligence in approaching the crossing, and were not guilty of negligence.

The railway company answered by general demurrer, special exceptions, general denial, and denial of the particular allegations of negligence, and set up contributory negligence on the part of the driver and other occupants of the automobile.

The case was submitted to a jury upon special issues, which were answered in favor of the railway company, and from a judgment in its favor this appeal is prosecuted.

The appellant presents only two grounds here upon which it is insisted that the judgment should be reversed and the cause remanded. The first is that some of the jurors were guilty of misconduct in visiting the scene of the accident during their deliberations and before the verdict was returned; and the second is the failure of the trial judge to instruct the jury not to consider a proposition made by defendant's counsel in open court, after the testimony was closed, to have the jury visit the crossing in question for the purpose of inspecting and viewing the conditions existing there.

The testimony was sharply conflicting upon all of the issues of the case, and especially the issues with reference to whether or not the signals by blowing the whistle and ringing the bell were given; whether the engineer and fireman exercised ordinary care in approaching the crossing to discover the presence of the occupants of the automobile, as well as upon the issue of contributory negligence of the occupants of the automobile.

The plaintiff excepted to the action of defendant's counsel in proposing, in the presence and hearing of the jury, that the jury be permitted to visit the scene of the accident while the court was preparing his charge. Upon the trial of the motion for rehearing, it was shown that the charge was given the jury on Saturday; that the jury deliberated a short time without arriving at a verdict, and were discharged until Monday morning; that on the intervening Sunday four of the jurors visited the crossing in question where the accident had occurred, about 12 months prior to the time of the trial. During the hearing of the motion for a new trial, Clark Rush, one of the jurors, testified that he went with another juror, Smallin, to the scene of the accident, and reached there about 5 or 6 o'clock Sunday afternoon, after the case had been argued by attorneys for both sides. His testimony is in part as follows:

"We went up there to the scene of the accident to look the situation over and to see whether the witnesses had told the truth about it or not. When we got up there we got out, drove the car along the side and looked to see if we could see a train if it was coming up that way. We entered from the same road that the Letsingers' car was on when the collision happened. We did not drive our car over the crossing; drove it up in the swag just after you turn the corner around a post of the railroad fence, just a little dip there. We did not see a train while we were there. We were going home on Saturday night, and were talking. We said we wished the judge would let us go over there. Mr. Smallin said, 'We will go over there tomorrow evening,' and I said, 'All right.' We went to the scene of the accident in Smallin's car.' While there I took observations of the railroad crossing and condition of the track and approaches to the track, also of the obstructions, telegraph poles, right of way fence, etc.' I heard all of the evidence introduced, but had not at that time made up my mind in the case. I made it up immediately Monday morning when I came back. Taking those observations up there on Sunday afternoon influenced my verdict, influenced me to find for the railway company against Mr. Letsinger. It was discussed in the jury room that we were out there Sunday afternoon. Me and Mr. Smallin both said something about being up there. Mr. Woods mentioned it first, and we said we had been up there too. Mr. Woods said he was there when the train came along in the afternoon. Mr. Smallin stated the following in the jury room; 'I had my mind made up before I went up there, and I wanted to go with Clark Rush so he could see the situation.' Mr. Smallin and I discussed with each other the condition we found up there at the crossing. I don't believe I would have decided this case on the issue against Mr. Letsinger on the evidence and charge of the court except by going up there and seeing the conditions myself. There was a part of the charge that I was holding out on, and that was about the ordinary care, and the jury told me that meant to stop, look, and listen, and that was the point I was holding out on, and I figured that they looked according to the testimony, but the jury held me down that that meant to stop, look, and listen, and I said it didn't, and there was where the tie was. I heard the evidence on the blasting of the whistle and ringing of the bell, but I didn't believe that the railroad company did that—that the engineer did that. I did not intend to violate any rule of the court in going up to this crossing. I thought it would be all right. I would not have gone up there if the court had instructed us not to go. I did not believe that the bell was rung continuously from the whistling post to the crossing. We talked the testimony over, and I didn't believe all of it. I was taking the testimony, and believed a part of that fireman's testimony that he did blow the whistle and ring the bell about 80 feet from the crossing. I believed that part of it, and believed he tried to do that, but I didn't believe that he rung the bell from the whistling post clear up to the crossing."

On being cross-examined, he testified further as follows:

"The fact that I went to the scene of the accident and took observations on Sunday influenced my answer to issues Nos. 1 and 3 in favor of the railroad company."

The juror Woods testified that he visited the scene of the accident on the same Sunday before the verdict was reached in the case, and further said:

"The reason I went up there was because I wanted to be there when the train came through. I wanted to make observations. I heard the whistle blown on that train. I did not hear the bell ring on account of the roar of the train, and it was almost to the crossing before I could hear the bell faintly. I could see the bell ring. I heard the whistle back somewhere about the whistling post, but did not take notice of the whistling post at that instant, but it was about where the whistling post was, and I didn't hear the bell ringing until it got very near the crossing. I mentioned that fact to the jury the next morning in my deliberations here with the jury. We all discussed it."

Smallin testified, in part, as follows:

"I went to the scene of the accident between Saturday night and Monday morning. I went there in company with Clark Rush; got there between 5 and 6 o'clock Sunday afternoon. I went there more through curiosity than anything else, just to see how it was, and took observations while there. We were there about ten minutes, and Mr. Rush and I talked about it while there; talked about we could see from the point there. No train came along while we were there. I would not have gone up to that crossing if I had thought the court did not want us to go up there. Clark Rush and I talked about what we could see while up there; also discussed the obstructions, such as right of way fence, telegraph poles, and condition of the ground; saw it all."

By R. S. art. 2175, the common-law practice of a trial of issues of fact by view has been expressly repealed (Gainesville, H. & W. Ry. Co. v. Waples, 3 Willson, Civ. Cas. Ct. App. § 410), and should not be permitted by the court without the consent of all parties to the suit (Fort Worth Improvement District v. Weatherred [Tex. Civ. App.] 149 S. W. 550). Our courts have not looked upon the practice with much favor, especially where the evidence, as in this case, fully describing the premises is supplemented by maps and photographs showing the place of the accident and its surroundings (Hovey v. Sanders [Tex. Civ. App.] 174 S. W. 1025), and, if agreed to by the parties, the rule is that view should be taken only under the order of the court and in the presence of the parties or their counsel. Gulf, C. & S. F. Ry. Co. v. Hamilton, 17 Tex. Civ. App. 76, 42 S. W. 358; Southern Traction Co. v. Wilson [Tex. Com. App.] 254 S. W. 1104). Texas Midland Ry. Co. v. Brown, 228 S. W. 915, was a personal injury suit in which the Commission of Appeals reversed the judgment; one ground of reversal being the action of the deputy sheriff while taking the jury out for a walk in leading them near the scene of the accident. In St. Louis S. W. Ry. Co. v. Waits

(Tex. Civ. App.) 164 S. W. 874, the court refused to reverse the judgment for the railway company where it was shown that the deputy sheriff had carried the jury to the scene of the accident, because the company's attorneys had afterward proposed the view by the jury, and for the further reason that the jurors saw nothing different from that described in the evidence, and because there was no discussion by them afterwards as to what their view had disclosed.

[1] No improper motive upon the part of defendant's counsel in this case in proposing that the jury be permitted to view the place of the accident is charged or shown, but appellant's counsel excepted because the proposal was made in the presence and hearing of the jury. We understand that the better practice is that all doubtful questions of evidence or procedure should not be proposed or discussed in the presence of the jury. Holliday Creamery Co. v. Haney (Tex. Civ. App.) 283 S. W. 938.

Appellant further requested the court to instruct the jury to disregard and not to consider the remarks made by appellee's counsel, because they were improper. The court did not so instruct the jury, but did not give the jury permission to visit the scene of the accident.

Judge Powell said in the Southern Traction Co. Case, supra:

"It seems that about noon one day, during the progress of the trial, one of the jurors visited the scene of the accident and viewed the situation himself. We will say, however, that this practice should be discouraged by the trial courts and the jurors warned, in the absence of mutual agreement of the parties litigant, to refrain from such practices. It is much better, as a rule, for jurors to get all of their evidence under the guidance of the court and in the presence of the attorneys for both sides. We regret to reach the conclusion that a reversal of this case is necessary. But the verdicts of our juries must be zealously safeguarded from all outside influence. The courts must maintain the efficiency of our jury system, if that priceless system is to remain the pride of our race. Our appellate courts, for years and years, have been urging trial courts to warn the juries against every kind of improper conduct. Not only so, but to grant new trials promptly when situations of this kind arise. There will be a great saving of time and expense to litigants if the trial courts themselves will adopt the practice of setting verdicts aside promptly when misconduct appears, and its effect upon the jury is reasonably doubtful."

[2] If the court had instructed the jury in this case not to consider the remarks of counsel, and had told them not to visit the scene of the accident, the rule announced by Judge Powell would have been complied with. We are not prepared to say that the visit by these jurors to the crossing in question, and their discussion with the other jurors the next day during their deliberation did not materially affect the verdict. The juror Rush states positively that his finding was influenced as the result of his observation made while at the scene of the accident. The testimony of Stroud, who was an eyewitness to the accident, and a resident near the crossing, was to the effect that at the time of the accident the crossing was very rough, and that the ground over which the automobile approached the crossing inside of the right of way had holes in the road, and was considerably lower than the remainder of the road near that point. He further testified that soon after the accident, and before the trial, the crossing had been repaired, the holes filled in, and the road approach to the crossing built up.

The contention of the appellant was that the sunken place in the road and the rough condition of the approach had a material bearing upon the issue of contributory negligence, for the reason that the driver, in order to avoid wrecking his automobile, was required to give part of his attention to the matter of avoiding the rough places, and, because the approach had been repaired and filled in and the grade of the approach raised at that place, the jurors were necessarily influenced in estimating the ability of the driver of the automobile to see the approaching train.

It is further insisted that before the grade of the road was raised it was more difficult to see the approaching train while it was on that part of the road described as being "dipped" several hundred feet south of the crossing. There is evidence tending to show that at the time of the accident, while the automobile was down in the lowest part of the approach, that only the top of the cars could be seen when looking to the south, because the dip was about 11 feet below the grade of the track between that point and the crossing, and that, after the grade crossing was raised at that place, the approaching train could be more readily seen.

[3, 4] The record discloses that the occupants of the Letsinger automobile, in crossing what some of the witnesses call a ditch or depression, and others describe as a dip or hole, were placed in a similar position as we find Laro in the case of Chicago, R. I. & G. Ry. Co. v. Laro (Tex. Civ. App.) 273 S. W. 684. After leaving the main road and turning to cross the track, their attention was necessarily divided between watching for approaching trains, and at the same time dealing with the unsettling conditions caused by the perverse steering gear and eccentric springs of a Ford automobile which was obstreperously floundering along a rough, "twisting" road. A juror stand there on the ground after the ditch or depression had been filled, and the approach raised and leveled, would naturally receive an entirely different impression of the conditions and surroundings than the Letsingers had on the day of the accident. Whatever may have been

the rule heretofore as to the effect of the misconduct of the jury, and the discretion of the trial court, and of this court in passing upon motions for rehearing based thereon, that rule no longer prevails. When the fact of misconduct has been shown, very little weight is given by later opinions from the Supreme Court and Commission of Appeals to the testimony from the jurors as to what effect the facts constituting the misconduct had or did not have upon them in making up their verdicts. It is held that as a matter of law there may be error, and the issue is made to turn on a reasonable doubt as to whether the misconduct might have affected the purity of the verdict. Gulf, C. & S. F. Ry. Co. v. Harvey (Tex. Com. App.) 278 S. W. 839; Id. (Tex. Com. App.) 276 S. W. 895; Moore v. Ivey (Tex Com. App.) 277 S. W. 106; Hines v. Parry (Tex. Com. App.) 238 S. W. 886; Parker v. Miller (Tex. Com. App.) 268 S. W. 727; Southern Traction Co v. Wilson, supra.

Based upon the doctrine announced in these cases, we have concluded that the judgment should be reversed and the cause remanded for another trial.

Reversed and remanded.